345 A.2d 671
COMMONWEALTH of Pennsylvania,
Appellee,

v.

Kenneth TERVALON, Appellant.

Supreme Court of Pennsylvania.

Argued April 7, 1975.

Decided Oct. 3, 1975.

582

584

Louis M. Natali, Jr., Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Carolyn E. Temin, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

On September 20, 1972, the appellant, Kenneth Tervalon, was convicted by a jury of murder in the first degree and of conspiracy to commit murder. Motions for a new trial and in arrest of judgment were denied on September 27, 1973. Thereafter, on February 2, 1974, a motion for a new trial was filed on grounds of after-discovered evidence and a hearing for the purpose of taking testimony on the motion was held on March 11, 1974. On August 16, 1974, the motion for a new trial on grounds of after-discovered evidence was dismissed and a sentence of life imprisonment was imposed on the murder conviction. This direct appeal then followed.

The prosecution emanated from the fatal shooting of Phillip Wormley in Philadelphia on the evening of November 22, 1970. The shooting, carried out by a group calling itself the "Black Liberation Army", was apparently in retaliation for Wormley's retention of proceeds obtained by the group during an earlier robbery of a Gino's restaurant.[1]

At trial, the Commonwealth's case against Tervalon rested primarily on the testimony of Kevin Hall, Willie Williams and Willene Eason. Both Hall and Williams testified that Tervalon was a member of the Black Liberation Army. Williams further testified that, on November 20, 1970, both he and Tervalon were present at and participated in a vote of the Black Liberation Army to execute Wormley. Miss Eason, Wormley's girl friend, testified that on the night of the shooting, Tervalon, with whom she had had previous contact, came to the door of the apartment she shared with Wormley and asked Wormley to go outside. Shortly after the two departed, she heard four gunshots coming from the direction of the driveway behind the apartment building. The police later found Wormley's lifeless body in this driveway.

Tervalon initially contends the trial court erred in refusing to grant him a new trial on the basis of after-discovered evidence. The law is well-settled that "[i]n order to justify the grant of a new trial on the basis of after-discovered evidence, the evidence must have been discovered after the trial and must be such that it could not have been obtained at the trial by reasonable diligence, must not be cumulative or merely impeach credibility, and must be such as would likely compel a different result: [cites omitted]". *Commonwealth v. Schuck*, 401 Pa. 222, 229, 164 A.2d 13, 17 (1960), cert. denied, 368 U.S. 884, 82 S.Ct. 138, 7 L.Ed.2d 188 (1961).

---

1. Ronald Murray, also a member of the Black Liberation Army, was slain along with Wormley.

See also *Commonwealth v. Cooney,* 444 Pa. 416, 417–418, 282 A.2d 29 (1971); *Commonwealth v. Bulted,* 443 Pa. 422, 428–429, 279 A.2d 158 (1971); *Commonwealth v. Mount,* 435 Pa. 419, 423, 257 A.2d 578 (1969). Moreover, unless there has been a clear abuse of discretion, the refusal of the trial court to grant a new trial on the basis of after-discovered evidence will not be disturbed. See *Commonwealth v. Mosteller,* 446 Pa. 83, 89, 284 A.2d 786 (1971); *Commonwealth v. Swanson,* 432 Pa. 293, 298, 248 A.2d 12 (1968).

A review of the record reveals that Richard Stewart, an indicted co-defendant, was at large in Canada during the time of Tervalon's trial. Stewart was apprehended on October 7, 1972, and returned for trial. Thereafter, both at his own trial and at the trial of Richard Alston, another co-defendant, Stewart testified that he [Stewart] had planned and carried out the Wormley killing and that Tervalon did not participate in any way. Subsequently, at a hearing on the motion for a new trial, Stewart repeated his story, directly contradicting the testimony of the Commonwealth witnesses. He denied Tervalon was ever a member of the Black Liberation Army. He admitted that a vote to kill Wormley had been held, but maintained that Tervalon was not present. And he indicated that two revolutionaries, Hasson and Abdul, not Tervalon, had been detailed to Wormley's apartment to bring Wormley down to the street.

██ The trial court, while recognizing that Stewart's testimony was after-discovered and could not have been discovered in time for Tervalon's trial by reasonable diligence, nevertheless denied Tervalon the requested relief. It concluded, after a careful review of Stewart's testimony and the testimony given by the Commonwealth witnesses at trial, that there was no likelihood the presentation of Stewart's testimony would compel a different result upon retrial. We agree.

Although Stewart did admit his participation in the Wormley killing, this admission was not new evidence. Williams, in his trial testimony, stated that Stewart had participated in the vote to kill Wormley and a dying declaration of Ronald Murray introduced into evidence named Stewart as being among those who shot him and Wormley. Therefore, this portion of Stewart's testimony was merely corroborative of and cumulative to evidence already adduced at trial and was not, in itself, likely to compel a different result. Cf. *Commonwealth v. Schuck,* supra; *Commonwealth v. Green,* 358 Pa. 192, 56 A.2d 95 (1948).

In addition, Stewart stated that Tervalon was not involved in the Wormley killing. However, by the time Stewart testified on Tervalon's behalf, he had already been tried for participation in the Wormley killing and had been found guilty of murder in the first degree. Therefore, his testimony was not unlike that of "a co-conspirator who is already in prison and realistically has little to lose by attempting to free his partner", *Commonwealth v. Mosteller,* supra at 91, 284 A.2d at 789, which testimony has traditionally been examined and considered with great caution. Cf. *Commonwealth v. Coleman,* 438 Pa. 373, 264 A.2d 649 (1970).[2] Moreover, it is striking, that while Stewart exonerated Tervalon and fingered Hasson, Abdul and Che as having participated in the Wormley killing, he indicated he would not cooperate in their apprehension or testify against them. In addition, Stewart's story could not be corroborated by the law enforcement authorities. Furthermore Stewart, upon questioning by the trial court, expressed his utter

---

2. In *Commonwealth v. Colon,* 461 Pa. 577, 337 A.2d 554 (1975), three members of this Court (Mr. Justice Roberts joined by Mr. Chief Justice Jones and Mr. Justice Manderino), in determining the trial court properly excluded from evidence an extrajudicial confession as not a declaration against penal interest, recognized the inherent unreliability of a confession exculpating possible accomplices at no cost to the declarant.

contempt for the law and the judicial system under which it operates. When Stewart's testimony is contrasted with the trial testimony of the three Commonwealth witnesses, including that of eyewitness identification, we can find no abuse of discretion in the trial court's determination that its presentation was not likely to compel a different result upon retrial.[3]

■ Tervalon next contends the trial court improperly permitted the Commonwealth to introduce in rebuttal, evidence of a statement he made to the police on the night of his arrest. At trial,[4] Tervalon's wife, Barbara, testified that she and Tervalon were at home all evening on November 22, 1970, except for a short period when he went out to buy her a special kind of cupcake. In rebuttal, to impeach this alibi testimony, the Commonwealth introduced Tervalon's statement in which he admitted being with a friend named Roger for part of the evening in question; in addition to going to the store in search of his wife's desired cupcake. Tervalon claims this rebuttal was improper and his statement could properly have been used to cross-examine only *his* testimony or to rebut evidence presented by him personally. Therefore, he argues, the evidentiary use of his statement to impeach his wife's testimony was hearsay and should not have

3. Tervalon contends we need not speculate as to the effect which Stewart's testimony would have upon retrial because Stewart's similar exoneration of Richard Alston, who was on trial for the murder of Ronald Murray, led to a jury acquittal of Alston. It is true that both Williams and Miss Eason testified for the Commonwealth in the Alston case, just as they did at the Tervalon trial. However, their testimony merely named Alston as a member of the Black Liberation Army and did not indicate that Alston participated in the vote to kill Murray or that he was present at the shooting. The only evidence directly implicating Alston was the dying declaration of Murray who had initially told the police he did not know who had shot him. Clearly, the evidence against Tervalon was much stronger than the Commonwealth's case against Alston and the jury's acquittal of Alston can, in no way, mandate a new trial for Tervalon.

4. Tervalon did not testify in his own behalf at trial.

been permitted. However, Tervalon is able to point to no authority which would support this proposed limitation upon the use of a defendant's extrajudicial statement,[5] and we find this claim devoid of merit.

As a general rule voluntary, extrajudicial statements made by a defendant may be used against that defendant although they contain no admission of guilt. *Commonwealth v. Wentzel,* 360 Pa. 137, 150, 61 A.2d 309 (1948); *Commonwealth v. Tenbroeck,* 265 Pa. 251, 254, 108 A. 635 (1919). See generally, McCormick Law of Evidence § 144 (2d ed. E. Cleary 1972). These extrajudicial statements, which differ from confessions in that they do not acknowledge all essential elements of a crime, are generally considered to qualify for introduction into evidence under the admission exception to the hearsay rule.[6] McCormick, supra, § 262; 4 Wigmore, Evidence § 1048 (Chadbourn rev. 1972).

While Tervalon's prior statement might properly have been received as part of the Commonwealth's case in chief, this fact does not necessarily exclude its use in rebuttal. Evidence is admissible in rebuttal to contradict that offered by a defendant or his witnesses, even though by doing so the Commonwealth supplies previous omissions from its case in chief. *Commonwealth v. Hickman,* 453 Pa. 427, 432, 309 A.2d 564 (1973); *Commonwealth v. Libonati,* 346 Pa. 504, 511, 31 A.2d 95 (1943); 2 Henry, Pennsylvania Evidence, § 730 (1953). We have previously stated that the order of presentation of evidence is a matter of sound discretion for the trial court. *Commonwealth v. Hickman,* supra; *Common-*

5. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), relied upon by Tervalon does not, in any way, lend support to his position.

6. Like confessions, admissions may only be introduced into evidence against a criminal defendant if the limitations of voluntariness and the observance of all constitutional requirements have been satisfied. See, e. g., *Miranda v. Arizona,* 384 U.S. 436, 476, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*wealth v. Koch*, 446 Pa. 469, 478, 288 A.2d 791 (1972). Instantly, the introduction into evidence of Tervalon's statement to the police during the Commonwealth's case in chief would have served little purpose as, standing alone, it contained little which was incriminatory. However, it served a vital evidentiary purpose when used to impeach the testimony of Tervalon's wife. Under these circumstances, we find no error in the trial court allowing the Commonwealth to use Tervalon's prior statement for the purpose noted.[7]

Tervalon further contends the trial court erred in not instructing the jury as to the limited effect of prior inconsistent statements; that they may be used only to impeach credibility and not as substantive evidence of the crime charged. The record reveals that Tervalon failed to request such an instruction nor did he take a specific exception to its omission from the charge. Therefore, this assignment of error has not been properly preserved for appellate review. *Commonwealth v. Carr*, 459 Pa. 262, 328 A.2d 512 (1974); *Commonwealth v. Yount*, 455 Pa. 303, 314 A.2d 242 (1974). See also

---

7. Tervalon also argues that his prior statement was the product of an unnecessary delay between arrest and arraignment in violation of Rule 118 (now 130) of the Pennsylvania Rules of Criminal Procedure and, hence, its evidentiary use at trial should not have been permitted. See *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972). Tervalon was arrested at his residence at approximately 2:30 a. m. on November 23, 1970, and transported to the Police Administration Building. He was placed in an interview room where he remained alone until 3:05 a. m., at which time he was advised of his constitutional rights as mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He was then questioned about the shooting and within forty five minutes made the oral statement which was used at trial by the Commonwealth. Even assuming, there may have been an "unnecessary delay" between the arrest and Tervalon's oral admission, see *Commonwealth v. Rowe*, 459 Pa. 163, 327 A. 2d 358 (1974), the evidentiary use of this statement was not proscribed under Rule 118 because this evidence was not reasonably related to the delay. *Commonwealth v. Palmer*, 463 Pa. ——, 342 A.2d 387 (1975); *Commonwealth v. Davis*, 460 Pa. 644, 334 A.2d 275 (1975).

*Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974).[8]

It is next urged the trial court erred in its supplemental instructions to the jury. After four and one-half hours of deliberation the jury asked the trial court whether a defendant could be found guilty of conspiracy and not guilty of murder. The trial court responded, without further explanation, that a defendant "may be guilty of conspiracy and not of murder, if a murder in fact did not result as a result of the conspiracy." Tervalon now asserts the mere answering of the jury's particular question was error as it resulted in a conflicting, confusing and unbalanced charge. He claims the trial court should have informed the jury that the supplemental instructions were only a portion of the entire charge, to be considered in conjunction with the earlier charge.

The feasibility and scope of any supplemental instructions to the jury is a matter residing within the discretion of the trial court and, as we noted in *Commonwealth v. McNeil,* 461 Pa. 709, 337 A.2d 840 (1975), the trial court is not obligated to give further instructions beyond those requested by the jury.[9] Cf. *United States v. Wharton,* 139 U.S.App.D.C. 293, 433 F.2d 451 (1970);

8. Tervalon contends that our decision in *Commonwealth v. Di-Pasquale,* 424 Pa. 500, 230 A.2d 449 (1967), indicates that in certain situations the trial court has an obligation, sua sponte, to give such a limiting instruction. Because *Commonwealth v. Di-Pasquale,* supra, decided prior to the effective date of Rule 1119(b) of the Pennsylvania Rules of Criminal Procedure which provides, "No portions of the charge nor omissions therefrom may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate", its determinations, in this regard, can be of no effect.

9. Section 5.3(b) of the ABA Project on Standards for Criminal Justice, Standards Relating to Trial by Jury (Approved Draft 1968) provides:
 "The court need not give additional instructions beyond those specifically requested by the jury, but in its discretion the court may also give or repeat other instructions to avoid giving undue prominence to the requested instructions."

*United States v. Salter,* 346 F.2d 509 (6th Cir. 1965), cert. denied, 383 U.S. 943, 86 S.Ct. 1196, 16 L.Ed.2d 206 (1966); *Apel v. United States,* 247 F.2d 277 (8th Cir. 1957); Wright, Federal Practice and Procedure, § 502 (1969). But cf. *United States v. Sutherland,* 428 F.2d 1152 (5th Cir. 1970); *Babson v. United States,* 330 F.2d 662 (9th Cir. 1964), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1045 (1964). Therefore, it follows that Tervalon's contention is without merit, particularly so, since Tervalon made no request for the additional instruction he now maintains should have been given.

 Tervalon next contends the trial court erred in refusing a request to instruct the jury that the testimony of Hall and Miss Eason, as accomplices of Tervalon, comes from a corrupt source and is to be carefully scrutinized and accepted with caution.[10] While the requested instruction is undoubtedly a correct statement of the law, *Commonwealth v. Sisak,* 436 Pa. 262, 259 A.2d 428 (1969), there was no evidence presented at trial to indicate that either Hall or Miss Eason had any role or participation in the Wormley killing. A trial court is not obliged to instruct a jury upon legal principles which have no applicability to the presented facts. There must be some relationship between the law upon which an instruction is required and the evidence presented at trial. *Commonwealth v. Bighum,* 452 Pa. 554, 559, 307 A.2d 255 (1973); *Commonwealth v. Coleman,* 402 Pa. 238, 242, 166 A.2d 525 (1961).

Tervalon next contends that, in accordance with the rationale mandating that defense counsel be permitted wide latitude in its cross-examination of an accomplice,

10. Tervalon also contends the trial court erred in instructing the jury that the guilt or innocence of a defendant may be predicated upon the uncorroborated testimony of an accomplice. However, this is a correct statement of the law in Pennsylvania and, therefore, a proper jury instruction. See, e. g., *Commonwealth v. Bradley,* 449 Pa. 19, 295 A.2d 842 (1972); *Commonwealth v. Bruno,* 316 Pa. 394, 175 A. 518 (1934).

prejudicial error occurred when defense counsel was restricted in his cross-examination of Miss Eason's attorney, Arthur L. Gutkin. We need not reach the merits of this contention for, as we have previously stated, there is nothing in the record to indicate that Miss Eason was an accomplice of Tervalon in the Wormley killing.

Tervalon further alleges that an outburst by the mother of the deceased during defense counsel's summation prejudiced the jury against him and requires the granting of a new trial. He also contends an evidentiary hearing must be held to determine if the Commonwealth knew, in advance, of the likelihood of such an outburst and failed to divulge such information to the defense in procuring its assent to her presence in the court room. The record, however, reveals that no objection was entered by defense counsel at the time of the outburst, nor was a motion for a mistrial made. As issues not properly raised in the court below are deemed waived for purposes of appeal, this issue is not properly before us. *Commonwealth v. Thomas*, 460 Pa. 442, 333 A.2d 856 (1975); *Commonwealth v. Glenn*, 459 Pa. 545, 330 A.2d 535 (1974). See also *Commonwealth v. Clair*, supra.

Finally, it is contended the district attorney exceeded the bounds of proper cross-examination of Tervalon's father, Alfred. The elder Tervalon was called as a witness by the defense to testify in support of his son's alibi defense. The district attorney, while questioning the elder Tervalon regarding his activities when he went to visit his son at the Police Administration Building, asked, "You, of course, advised Kenneth not to say anything further to the police?" An immediate objection to this question was interposed by the defense, but this objection was overruled by the trial court. The elder Tervalon then responded, "Not in those words, no sir." Tervalon now contends the district attorney committed reversible error by attempting to create an impermissible

adverse inference in the minds of the jurors regarding the exercise of his Fifth Amendment rights at trial.

While it is fundamental that the Fifth Amendment forbids comment by the prosecution on the accused's silence at trial, *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Commonwealth v. Davis,* 452 Pa. 171, 305 A.2d 715 (1973), the cross-examination complained of did not either expressly or by reasonable implication indicate that an adverse inference could be drawn from the failure of Tervalon to testify nor did it draw attention to his failure to do so. The district attorney did not remark that Tervalon failed to testify nor did he state the Commonwealth's evidence was uncontroverted. See *Commonwealth v. Davis,* supra; *Commonwealth v. Reichard,* 211 Pa.Super. 55, 233 A.2d 603 (1967). Rather, the cross-examination pertained to activities which occurred long before the trial took place.[11]

Judgment of sentence affirmed.

NIX, J., did not participate in the consideration or decision of this case.

ROBERTS, J., filed a dissenting opinion in which MANDERINO, J., joins.

ROBERTS, Justice (dissenting).

The statement appellant gave the police was clearly a product of a violation of Pa.R.Crim.P. 118 (now 130) and was therefore inadmissible, *Commonwealth v. Futch,* 447 Pa. 389, 290 A.2d 417 (1972). Because the Com-

---

11. We note that Tervalon did not raise the issue of whether this cross-examination would have led the jury to infer that he refused to make a statement at the time of his arrest. See *Commonwealth v. Stafford,* 450 Pa. 252, 299 A.2d 590 (1973); *Commonwealth v. Haideman,* 449 Pa. 367, 296 A.2d 765 (1972). Therefore, we need not address ourselves to this question.

monwealth was permitted to use this statement, appellant is entitled to a new trial.

Appellant was arrested at 2:30 a. m., on November 23, 1970. The police dallied for almost 24 hours while appellant was confined before they brought appellant before a magistrate for preliminary arraignment. Meanwhile, they repeatedly sought to obtain a statement from him. At about 4:30 a. m., November 23, their efforts bore fruit when appellant admitted he had been in the victim's apartment building on the night of the murder. This statement was used at trial to refute appellant's alibi defense. The claim was properly preserved for appellate review.

The Commonwealth does not deny that the delay between arrest and the time at which appellant made his statement was unnecessary. Instead, it argues that there was no causal connection between the delay and the statement and therefore that the statement is not inadmissible under *Futch.*

While it is true that a defendant must show "a nexus between the delay and the challenged evidence," *Commonwealth v. Tingle,* 451 Pa. 241, 244, 301 A.2d 701, 703 (1973), we have repeatedly held that this requirement is met unless the evidence obtained during the unnecessary delay bore "no reasonable relationship to the delay whatsoever." *Futch,* supra at 394, 290 A.2d at 419. See, e. g., *Commonwealth v. Cullison,* 461 Pa. 301, 336 A.2d 296 (1975) ; *Commonwealth v. Barilak,* 460 Pa. 449, 333 A. 2d 859 (1975) ; *Tingle,* supra. When it is established that an accused has given a statement while in custody during an unnecessary delay between arrest and arraignment, it is the Commonwealth's responsibility to prove that the statement was a product of circumstances other than the delay.

Here the police used the delay as an opportunity to repeatedly attempt to extract a confession. They were eventually rewarded with a statement that was instru-

mental in rebutting appellant's alibi defense. Surely this is not a case where the evidence bore no reasonable relation to the delay whatsoever. It must be concluded that the admission of the statement at trial was reversible error and I therefore dissent.

MANDERINO, J., joins in this dissenting opinion.